v. SPD Swiss Precision Diagnostics Mark Finkelstein, of Umbridge-Zipzer, for plaintiffs and appellants The defendants sell at-home ovulation tests. They detect a surge in LH, or luteinizing hormone, and they claim to be 99% accurate. But these ovulation tests are not 99% accurate at predicting ovulation. Now, the issue in this case is not whether the defendants can sell at-home ovulation tests, or whether the tests can use a surge in LH as a proxy to predict ovulation. Instead, the issue boils down to the following question. May defendants claim that their ovulation tests are 99% accurate, when that's simply not true? When this court reviews this matter... You look at the whole package, though, right? And they point to the side panels, which explain what the 99% is in reference to. There's LH surge all over the labels. And, for example, the clear blue kit, if you look at it, says, detects a hormonal surge in your urine, which occurs prior to ovulation. So, if a consumer looks at that, they obviously know it's not testing for the ovulation itself, right? It's testing the LH. I don't think a consumer cares how exactly it tests for ovulation. Consumers buy this product because they're interested in knowing, are they going to ovulate? So, wait a minute. If they don't care how it tests, then why do your consumers have a problem with it? I'm sorry, they care about whether they're going to ovulate. That's the issue. Right, but you just said they don't care how they test. They don't care... And if they test through LH, then what's the problem? The problem is that the packaging purports to test ovulation with 99% accuracy. And if I could address Your Honor's question about the side of the box. Both Whiteside and Mantecas make clear that, initially, only the front label should be reviewed. That's the test. Yeah, but if you have a little asterisk at the 99, everybody knows the asterisk means you've got to read something. Right, or dagger. Manteca says only if it's affirmatively inaccurate, the front label, then there's a problem. You don't consider, then, the back label, the side label. But there's no label that says this 99% accurate for ovulation. There's no label that says that, right? Well, I would disagree. For instance, if you look at the CVS test, it's called a one-step ovulation test. It says predicts ovulation 24 to 48 hours in advance. It says over 99% accurate. That's what it says. The question is, when you're looking at this, have we plausibly alleged that a reasonable consumer would view the label as saying, as representing that it can predict ovulation with 99% accuracy? Is that reasonable? Have we plausibly alleged that? And here, if you look at the test, it's called an ovulation test. It says 99% accurate. It says it'll predict ovulation. The clear blue says identify your two most fertile days. It has a picture of a baby. That's what it says. That's what they're selling. So could a consumer reasonably believe that's what to buy, a test that can predict ovulation with 99% accuracy? And if you do look to the side and back of the packaging, as Your Honor was saying, if you do think, we don't believe the package is ambiguous. And again, ambiguous doesn't mean two people might come to contrary views. That's not ambiguous. Ambiguous means, would consumers necessarily need more information before concluding what this means? So would a consumer look at this and say, I know what it means. Ovulation test predicts ovulation 24 to 48 hours in advance, over 99% accurate. This must be able to predict ovulation with 99% accuracy. If a reasonable consumer could believe that, if we plausibly allege that, you don't go any further. But if you do go further and look at the sides and back of the packaging, as Your Honor said, the question is, does that contain confirming information, not conflicting information? Where do the packaging say, yes, they say LH, yes, they say that's the mechanism, but nowhere in any of these packaging does it say, by the way, this cannot predict ovulation with 99% accuracy. Well, the target kit says on the side label, early ovulation test detects the increase in LH surge in urine, which usually occurs in women 24 to 40 hours before ovulation, the days when you are most able to become pregnant. So how can anybody reading that think that it's testing the ovulation itself? It's clearly testing this hormone in advance of ovulation. And again, we don't contest that you can't test the hormone. It's telling them that it's testing the hormone, right? Isn't that tell them that it's testing the hormone? Yes, but it doesn't tell them, by the way, it won't predict ovulation with 99% accuracy. Let me give you an example. We live in a world where, for instance, our watches can tell us our blood oxygen level. That's what watches can do. Nobody thinks the watch is taking a prick of your blood and putting it under a microscope. They don't know if it's pulse oximetry that's doing it. What they know is they look at their watch, it says your oxygen level is 98%. That's what they think. Here, they take a test. The box says 99% accuracy. They know that there's some mechanism to doing it. You're urinating on a stick. Obviously, it's not an ultrasound. There's some mechanism in the device that's telling you if you're going to ovulate, just like telling you if you're going to be pregnant. If you're pregnant, a lot of these also have pregnancy tests associated with it. But reasonable consumers are going to look at this packaging and believe it predicts ovulation with 99% accuracy. Can I just make sure I understand your claim then? You would agree that your claim fails if a reasonable consumer would read the side, right? No, Your Honor. You think that even if they read the side, with all this discussion of the LH surge, it's still deceptive? Yes, Your Honor. The reason being, nowhere on the side does it tell consumers this cannot predict ovulation with 99% accuracy. Just like if your watch says, we don't actually take a little bit of your blood and look under a microscope. We use pulse oximetry to figure out how much oxygen is in your blood. So you think even on the packages that have the asterisk next to 99.9, if a consumer looks at the asterisk, thinks, let me find where the asterisk leads me, and they read that information on whichever box that defines it as the LH surge, you think that a consumer will not think that that is simply a restatement of what the 99% accuracy is referring to? I think consumers will see what's the mechanism that this product works. So why do you think a consumer would follow the asterisk from the 99% to the explanation and think those two things don't have anything to do with each other? I think they would think it. They would still think, though, these are ovulation tests. The mechanism is looking at an LH surge. But by looking at the LH surge, it can predict ovulation with 99% accuracy. That's what we believe a reasonable consumer. And by the way the LH surge is 90% accurate as to predicting ovulation, isn't it? That's what the FDA says. That's correct, Your Honor. The FDA says it's only about 90% accurate in detecting ovulation. Would your claim be the same if the box said predictable or the test is 99% accurate with regard to predicting factors that indicate ovulation? I think if it said not 99% accurate at predicting ovulation or if it said actually how accurate it is at predicting ovulation. Consumers that are buying the product should know what they're purchasing. Are they buying a product that's 99% accurate or are they buying a product that's less than 99% accurate? Judge Reyes referred to your clients as informed consumers. Do you take exception to that? Are your clients people who are, I mean, is this a population of people who are drawn to this test because they're specifically using it to help them with regard to family planning? I think a lot of people are, but I don't think that makes them any more likely to know that the ad is deceptive. So I think what the judge was… I'm wondering if someone's deciding to get pregnant and I mean I find it interesting a male judge is telling us what women are thinking about when they're… I mean, you know, most men do not understand, I may be speaking generationally here, but understand the physiology or the chemistry of ovulation. And I'm not… I guess I struggle a little bit how he makes this conclusion. This is analogizing to people who are really, really interested in a particular type of honey, for Christ's sakes, that the California case was about. I mean, those people were devotees of a particular type of honey. And the analogy strikes me as a little odd with regard to people who fully appreciate how their body works with regard to making babies. I certainly agree that Moore's case is very distinguishable than this case, Your Honor, but I don't believe that the class of people that would buy these products have some specialized knowledge such that they would know that the product… I guess kind of a circuitous route to get to. You're not taking exception as to the difference of 99 versus 90. Your focus is on the fact that they're talking about ovulation, which is understood as being directly tied to the ability to have a child or create a child as opposed to the steps that go into understanding high hormone levels correlated to windows of possible ovulation to then pregnancy. Yeah, I think our argument is pretty basic. People are buying these tests because they want to know when they're going to ovulate. They're called ovulation tests. They advertise that as telling you the best days you're going to conceive. They say 99% accurate. They're not 99% accurate at predicting ovulation. I seem already out of my time. Thank you. Thank you. Mr. Simon. Good morning, Your Honors, and may it please the Court. Norman Simon on behalf of Appellee's Defendants. Your Honors, there were two distinct grounds on which the district court rightly held that the plaintiff's interpretation of these kits is unreasonable as a matter of law. In Paragraph 67 of the complaint in the record at A48, the plaintiffs allege that currently the only method to predict ovulation with a high degree of accuracy is a transvaginal ultrasound. And based on that allegation, the court found that it is impossible for there to be at-home kits that directly assess ovulation. Plaintiffs take issue with the court's determination that consumers of the kits would know that it's impossible to find an at-home product that directly detects ovulation in that manner. But again, the court looked to plaintiffs' own allegations that consumers of these kits have had trouble getting pregnant in the past and they seek help in getting pregnant. That's at Paragraph 64 of the First Amendment complaint. And the court determined that such consumers would reasonably be expected to have at least some information leading up to their purchase and would know what to expect in the marketplace. And, Your Honor, in that sense is how the court analogized to Manuka honey in the Moore case. The district court essentially said that those consumers of that specialized kind of a product would have some knowledge as they went into the store to purchase it. Likewise here, because these consumers are alleged to have had difficulty conceiving, they would have some knowledge about the basics about how to get pregnant. And plaintiffs essentially ignore Iqbal's tenet that in determining whether a complaint states a plausible claim for relief, it's a context-specific task. I know you have the Moore case, and we can debate. I had the same question Judge Wesley had, was you compare honey to something like fertility, an effort to figure out fertility. But we've never had this sort of heightened reasonable consumer standard depending upon the product. What case would you cite in this circuit where we've said, well, for this product, the reasonable consumer should have sort of a heightened duty of care to have done some research on this? Your Honor, we're not saying there's a heightened standard of care. We're just saying that the product at issue is considered by the court. And there are two instances in this jurisdiction. But we always say product in the context of the packaging. I don't know which case you would cite for the idea that, well, these consumers would know more because of the circumstances. There was a recent case out of the southern district, the Danone case, involving a claim of carbon neutral. This court. Oh, I'm sorry. That's the second circuit, Your Honor. District court's in this. We'd be saying something new, right? We'd be saying, well, because of the nature of these tests and what they're testing for, we would expect a reasonable consumer to have a lot more understanding of what's possible and what's not possible. Your Honor. Not everybody. You know, not every people could buy this as their first step in trying to get pregnant. They may not have, you know, gone to any fertility treatment, a doctor. Right? Yep. Well, Your Honor, to your point, the court need not go there. Because the district court rightly found an independent basis why consumers would look to the totality of the packaging, putting aside the particular product at issue. And that is, at best, there is an ambiguity in the meaning of ovulation. It could either mean direct or indirect assessment of ovulation. And for that reason, the court said it was appropriate to look at the full context of the label, front, side, and back. And it is important to note here that nearly all of these products on their front labels make very clear that LH Surge is what's being assessed here. Many of them show images of the test sticks depicting LH Surge or no LH Surge right on the front. As Your Honor noted, there's an asterisk or a symbol next to the 99% accurate claim on most of these packages directing consumers to another portion of the packaging that explains the accuracy refers to the detection of the LH Surge that precedes ovulation. Many of them say seaside of pack right on the front of the packaging. Some kits contain all three of those statements. Now, plaintiffs argue that those should make no difference. But even plaintiff's own authority, the Whiteside case in the Ninth Circuit, confirms that a plaintiff cannot simply look at a statement on the front of the label, ignore the asterisk, and claim that she has been misled. We believe that this Court's recent decision in Bates v. Abbott Labs, which was decided just this January after this case was fully briefed, is particularly instructive here. As in that case, here there is no affirmative misrepresentation on the front label. And at that case, Your Honors, two of Your Honors were on that panel, and they remember there were some health claims that were on the front of the panel, and the ingredient list disclosed that there was sugar in the product. The allegation was because of the sugar, they were unhealthy. And this Court found that there was no affirmative misrepresentation on the front label, and just like the case here, there's no affirmative representation that the kits directly test for ovulation in the manner alleged. But to the extent the front label statement implicitly creates an ambiguity on this point, as in the Bates case, it's cured here by the accurate statements elsewhere on the packaging, on the front, side, and back, that the products detect with 99% accuracy the LH surge that precedes ovulation. To argue that the sides and the backs don't clarify the front label, the plaintiffs have made various arguments in their briefs which are unavailing. They initially took the position that the packaging does not state that the products test for LH, not ovulation itself, but fail to explain why that specific phrasing is required or how it's materially different from disclaimers that do exist. As this Court again found in the Bates case, General Business Law 349 surely does not require businesses to ascertain consumers' individual needs and guarantee each consumer has all relevant information specific to her specific situation. Now when reply plaintiffs assert that even accepting that a reasonable consumer would adopt the District Court's interpretations of the sides and backs of the packaging, that would not lead a reasonable consumer to understand it's impossible for an at-home urine test to test for actual ovulation. But that conflates the two separate bases for dismissal by the Court below. The impossibility of testing directly for ovulation in an at-home kit, that's based on plaintiff's own allegation that the only way to do that is a transvaginal ultrasound. And it shows that their interpretation of the front label, even beyond reaching the back or side, is implausible. The question here is whether clarifying context on the back and the sides dispel the theory of falsity, which is that the kits are 99% accurate at detecting LH surge as opposed to ovulation directly. And they clearly do that. I think, Your Honors, with regard to the unjust enrichment claim, the District Court properly held that it was duplicative of the GBL claim under the New York Court of Appeals decision in Corsello. There is some dispute about that among the District Courts. And my question to you is do we need to reach that if the theory of unjust about this was the deception, if the GBL claim fails, even if there are circumstances where it would not be duplicative, it would be duplicative based upon the theory here, right? Correct, Your Honor. In any event, if there's no deceptive conduct as a matter of law, you do not need to reach that claim. That's correct, Your Honor. I want to ask you about the FDA. There was a reference to the FDA website. Yes. And, again, it's kind of the same thing playing into the issue. And they brief it in conjunction with more, you know, that wasn't a suggestion that the reasonable consumer should have checked the FDA website. That's not what Judge Reyes was saying on that, right? That's correct, Your Honor. The District Court did not hold and defendants did not argue that consumers have to read the FDA website in order not to be misled. The District Court did not rely on the FDA website in observing that the product directs ovulation. It looked at plaintiffs' own allegations in that regard, as I noted. And to the point that Your Honor, that Judge Wesley raised earlier about the 90% versus 99%, the court actually addressed that. What the website says is generally an LH test is 90% effective.  These specific, there's nothing inconsistent with that general statement in that these specific products are 99% accurate at detecting the LH. And so there is no factual controversy that was created by that statement. Right. And the court addressed that in its decision in a footnote. Your Honor, just finally, I would like to address the fact that the complaint was dismissed with prejudice. We believe that was appropriate and should be affirmed because notwithstanding multiple opportunities, plaintiffs failed to explain in any of their briefs or to this court how they would amend their complaint to cure its fatal deficiencies. Indeed, plaintiff amended twice with the benefit of defendants' pre-motion letters that articulated the grounds on which defendants moved to dismiss, even incorporated one of those pre-motion letters into the amended complaint. Plaintiff simply chose not to amend to address the substantive deficiencies identified in those letters. We frankly don't think they can, including the grounds on which the district court ultimately dismissed the complaint. And for that reason, we respectfully submit it is appropriate to affirm here with prejudice. And we thank your Honors for your attention. All right. Thank you. All right, Mr. Finkelstein, you have two minutes in rebuttal. Thank you. Let me start with the impossibility argument. Essentially, defendants argue that it's so obvious that the representations are false, people would know it's impossible. Therefore, it's okay to deceive. So for instance, if you look at the soy milk case, the court said nobody would think that soy milk actually comes from a cow. That's impossible. Therefore, an allegation that the name soy milk is deceptive is unreasonable because everybody knows it's impossible. On the other hand, as the white side court said, if you make a baby wipe and call it plant-based, even though that's impossible to not have any synthetic ingredients, people wouldn't necessarily know that. They don't know it's obviously false. That's really what impossibility gets to, is it's so outlandish, so flatly implausible that people would know it's false. And I would submit here that's not the case. We live in an amazing world. I mentioned watches that can predict, I mean, tell your blood oxygen level or give you an electrocardiogram. A driverless car drove me to the airport to fly here. I can spit in a tube and learn where my ancestors came from centuries ago. Why is it unreasonable for consumers to believe an at-home ovulation test can predict ovulation with 99% accuracy, as stated? Now, the issue of direct or indirect, I think, is a red herring. Again, what consumers want to know is this ovulation test, can it predict ovulation with 99% accuracy? Why don't the defendants simply say what the actual number is? It's less than 99%. We believe it's less than 90%. But they are telling consumers that it can predict ovulation with 99% accuracy. I think the permits would be dangerous here. It would essentially give companies a free pass to deceive consumers when it comes to efficacy claims, especially directed to medical products to a subset of the general population. We ask that the district court's order be reversed. Thank you. All right. Thank you. Thank you both. We'll reserve decision. Have a good day. Thank you, Your Honor.